No. 13,781.

HENRY BOSCH COMPANY *v.* GUIRY BROTHERS WALL PAPER
COMPANY.
(62 P. [2d] 1325)

Decided November 23, 1936.

Mr. JOHN E. FITZPATRICK, Mr. L. E. F. TALKINGTON, for
plaintiff in error.

Mr. IRA C. ROTHGERBER, Mr. WALTER M. APPEL, Mr. IRA
C. ROTHGERBER, JR., for defendant in error.

*In Department.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

HENRY Bosch Company brought this action against
Guiry Brothers Wall Paper Company to recover the
sum of $250.24 on account stated for goods, wares and
merchandise sold and delivered to the latter. The case
was tried to a jury upon the complaint, answer and coun-
terclaim, and judgment entered upon its verdict in favor

of defendant in the sum of $1,320. To reverse this judgment, the Bosch company assigns error. In this opinion reference will be made to the parties as plaintiff and defendant.

Plaintiff is an Illinois corporation engaged in the manufacture of wall paper with offices at Chicago. Defendant is a Colorado corporation with offices located in Denver, and is engaged in paint contracting and in the wholesaling and retailing of wallpaper. J. P. Guiry is president of the defendant, and Quackenbush is factory superintendent and sales manager of plaintiff. Business relations between the two companies began in 1925, whereby defendant company sold plaintiff's product in what is known as the Denver territory which included Colorado and all or parts of surrounding states. The record discloses that through this business relationship, the defendant company handled plaintiff's product exclusively in the mentioned territory, until sometime in 1932, when differences arose which caused plaintiff to place its line with another Denver concern. At this time defendant was indebted to plaintiff in the amount sued for. Defendant admitted the correctness of the amount but denied owing it because of the allegations of its counterclaim by which it set out that plaintiff was indebted to it in the sum of $3,099.76 for expenses and loss of profits after the deduction of its indebtedness due on the book account.

Defendant alleged an oral contract with plaintiff in July, 1932, at Chicago, to the effect that it was to have the exclusive right to sell plaintiff's merchandise in the Denver territory for the following year in the same manner as it had in prior years. Plaintiff contends that no contract existed; that there is a variance between the allegations of the cross complaint and the proof, and that the evidence does not support the jury's verdict. The last contention becomes important only in the event it is determined that a contract existed and that there is

no fatal variance between the allegations of the cross complaint and the proof.

Whether or not a contract which would support the judgment existed, depends largely upon the testimony of Guiry, president of the Denver company, favored by the judgment. It seems that it is the custom to manufacture wallpaper and complete arrangements for its distribution in advance of its disposition to the trade. To do this requires an inspection of the manufactured line by the distributor with a view to making selections, and when such selections are made, sample books are prepared for the use of the distributor, all of which requires several months' time. Some preliminary correspondence between the parties took place in 1932, prior to July, at which time Mr. Guiry visited plaintiff's factory in Chicago where he had a conversation with Mr. White, a travelling sales representative, and Mr. Quackenbush, factory superintendent and sales manager of plaintiff company. In his testimony, Guiry gave the conversation as follows:

"Q. State what conversation you had with Mr. Quackenbush and Mr. White respecting business for the succeeding year.

"A. I looked over the line, and they had made quite a departure, quite a noticeable advancement in their designs and colors. I complimented them on them highly, and told them that we had decided on putting out two men that year. In other years we just had one man out, but it was awful hard business. Then their line was so good I thought it would justify putting two men out on the road. There was nothing said whether I was to have the line. They said, 'You know, Guiry, we need the business this year and you are the only one got it out there. We hope you will push it.' I told them I had intended pushing it, because I was putting on another man. 'Well, that's fine; hope you will do well. We will give you all the service we possibly can on it.' Their service was always good and their line was always good.''

If a contract was made in Chicago, as alleged in the cross complaint, it is to be found in the above quoted testimony. At the trial, it was shown that during the time of Mr. Guiry's visit to Chicago and afterwards, and prior to about September 10, some of the customary transactions relative to the selection of wallpaper and the preparation of sample books took place. On or about September 10th, Mr. White, representing plaintiff, called on defendant at Denver, relative to which visit Guiry testified: ''He wanted to know about how much business we were going to give them. I told him, 'Well, we have got your end of what we are going to buy pretty well selected. It will depend on your line, what it will do on the road. I think it will do pretty good. Why do you want to know how much business? We can't tell by the initial order; it is not a criterion of the amount of business we are going to give you because when we make our selection we don't know for sure.' * * * 'I can't tell what our orders will be.' '' Further as to what White said to him, he testified: '' 'Well,' he says, 'I will tell you, Joe, I've got orders from Mr. Quackenbush that if you can't give us a substantial increase in business we are directed to show samples of the line.' * * * and he said Mr. Quackenbush's orders was that we were to buy them three books as is, or else he was to look for another agent in this territory. * * * 'Mr. White,' I said, ''that is just absolutely ridiculous, for to select our whole line and background from the output put out from one factory, that don't cover the line of the wallpaper industry complete.' * * * 'I know Mr. Quackenbush, and he is too square a man, and knows business too well, to ask me to do such a thing, a little firm like us; it is just impossible.' White said, * * * 'I can prove it in black and white.' * * * 'Mr. Quackenbush had only asked for a substantial increase in business, or else they would see somebody else.' I says, 'Alright, Bill, that's reasonable.' I asked him how much we had bought last year, and he told me $3800 or $3900. I said, 'Well, that's

kind of small, but it was a bad year.' I says, 'What do you call substantial business for your line?' 'Well,' he says, 'in this territory, $5,000.' I says, 'That's very reasonable. I'll go you one better, I'll give you $6,000.' * * * 'I've got to have this line for this year. You can impose any reasonable terms on me and I'll accept them, excepting the one you first stated. I have got my men out * * * I am right in the middle; we have only two months' time to get all of our orders in, and if you pull off now I will lose the whole season.' * * * He said, 'No, I am running this territory; that's my proposition, to take the three books as is. We want whoever we deal with to handle Bosch exclusively.' Then I talked with him and begged with him to leave me finish the season out. * * * He said then that he would telephone * * * to Quackenbush, and see what he would say, and he went away and never came back. He only came back one day and picked up those sample books * * * ."

Following this, correspondence passed between Guiry and Quackenbush relative to the whole matter which discloses that no definite contract was entered into in Chicago as alleged or in Denver as was attempted to be shown by the evidence, and further that Guiry was in doubt as to whether he was to sell plaintiff's line on the road. It appears that Quackenbush advised that they would supply such items as had been sold without definitely stating that they would continue to so supply, whereupon Guiry notified Quackenbush on October 6, 1932, that he had called his men in and switched lines; that there was, and had been, no specific arrangement or contract during the past relationship. That none was made in 1932, either in Chicago or Denver, is disclosed by Guiry's testimony, and the correspondence constituting the exhibits appearing in the record. The situation is well expressed by the following paragraph from one of the exhibits, being a letter from plaintiff to defendant under date of May 18, 1933.

"We know that if the shoe was on the other foot and our line did not come up to your requirements, or our prices were not just what you though they should be there would be no hesitancy on your part in refusing to place your order with us and no reason in the world why you could not change your connections."

It is apparent that defendant had sold plaintiff's wall-paper for a number of years together with others and that it had had the exclusive privilege of handling the Bosch company's product without any obligation to purchase any of its merchandise at all in any particular year. Under the arrangement, defendant had not ordered a substantial amount of plaintiff's line the preceding year and in course of the correspondence, defendant, in a letter to plaintiff, expressed surprise that more of plaintiff's line had not been sold. With this uncertainty existing and there being no specific contract, plaintiff was within its rights in imposing different requirements as a consideration for extending to defendant the exclusive right to handle its line. Under the contract alleged by defendant, the latter was not required to do anything; it did not even obligate itself to purchase any of the merchandise while holding an exclusive right as against all others to sell the line in the Denver territory. It was left free to purchase or not purchase from plaintiff's line as it might elect and plaintiff was not obligated to sell any specified amount to defendant, other than to fill its orders. Without having passed any consideration, defendant could not hold plaintiff to a contract that seems to lack mutuality. Plaintiff could not be bound by the past custom in business relations which had existed and under which—conditioned on the will of defendant's officers—no particular quantity ever was ordered or to be ordered, and under an arrangement whereby defendant was under no obligation to want or order any of the line at all. Defendant could have discontinued plaintiff's line at any time without incurring liability, and it follows that the right to withdraw the same might be

exercised by plaintiff. Although defendant claims that it was to have the line as long as it wanted it, it relied upon an uncertain custom, in which there was no essential element of an agreed bargain or exchange, at its own risk, and such custom does not furnish a basis or consideration for holding plaintiff in damages. Nothing is disclosed by the record obligating defendant to purchase any of plaintiff's line. It contends that its offer to purchase merchandise of the value of $6,000 for the ensuing year completed a contract binding upon plaintiff. This offer was made after a time when defendant claims it was arranging, at some expense, to proceed according to custom to do business under an arrangement by which it was not obligated to do anything at all. In other words, defendant was following a course of action whereby it would profit on such goods as it might order and sell while plaintiff stood by to await the good or bad results of such arrangement. If defendant sold, and was able to deliver, plaintiff's merchandise, it would profit; if it made no sales, it would not lose. To this indefinite state of affairs, plaintiff objected, and it refused to proceed under such uncertainties. After its refusal, plaintiff made the $6,000 "offer." If there was lack of consideration and mutuality, and we think there was, this offer or even an order for goods, coming after plaintiff had refused to negotiate further, would not validate an uncertain arrangement so that it would become a binding contract upon plaintiff without the latter's full and complete acquiescence therein. Instead of an existing contract between the parties, as defendant claims, we have an attempt upon the part of defendant to negotiate such a contract. Defendant's offer was not accepted and consequently no contract followed. The expenses alleged, in the disclosed circumstances, were incurred by defendant at his peril.

The trial court was in error in not sustaining plaintiff's motion for a directed verdict in its favor. The

amount of the indebtedness being admitted judgment should have been entered accordingly.

Judgment reversed and the cause remanded for further proceedings in harmony with the views herein expressed.

MR. JUSTICE BURKE, sitting for MR. CHIEF JUSTICE CAMPBELL, and MR. JUSTICE HILLIARD concur.