**SMITH–WOLF CONSTRUCTION, INC., a Colorado corporation, Plaintiff–Appellee,**

**v.**

**Al HOOD, d/b/a Abco Waterproofing Specialists, d/b/a Abco Roofing and Waterproofing, Defendant–Appellant.**

**No. 84CA0841.**

Colorado Court of Appeals, Div. I.

April 28, 1988.

Wood, Ris & Hames, P.C., F. Michael Ludwig, Clifton J. Latiolais, Jr., Denver, for plaintiff-appellee.

Glicksman, Woodrow and Shaner, Daniel L. Woodrow, Michelle B. Teitelbaum, Denver, for defendant-appellant.

CRISWELL, Judge.

Defendant, Al Hood, appeals from the district court judgment that awarded plaintiff $52,646 in damages for breach of express and implied warranties relating to a waterproofing product manufactured by

defendant. We affirm in part and reverse in part.

Plaintiff entered into a subcontract with the general contractor to perform waterproofing services in conjunction with the construction of the second bore of the Eisenhower Tunnel. Prior to preparing its bid that led to this subcontract, plaintiff's agent had several conversations with defendant concerning its waterproofing product, Deckseal. In these conversations, defendant represented and warranted, among other things, that he was familiar with the requirements for such work, that his product could be used to perform the work required with only two kettles to heat the product, and that a crew of five, working with "squeegees" to apply the product to the surfaces required, could waterproof about 13,500 square feet per day.

Relying upon these representations, plaintiff prepared and presented a bid to the general contractor for a total of $153,995, which figure included an allowance for direct costs, an allowance for pro rata overhead costs (based upon a formula provided by plaintiff's accountant), and a profit. Plaintiff's bid was accepted and a subcontract, using plaintiff's bid figure as the contract price, was executed by the general contractor and plaintiff.

Plaintiff thereupon paid defendant for all of the Deckseal product that it expected to use on the project, although only a portion of the product was initially delivered to the jobsite. However, as plaintiff commenced to use the product in the manner suggested by defendant, several problems were encountered. In the beginning, the first Deckseal supplied by defendant had hardened in its containers and could not be removed. In addition, it was impossible to heat the product to the temperature required within the time outlined by defendant with only two kettles, so that three or four kettles, and a crew of 10 or 11, rather than five, persons was required to perform the work under plaintiff's subcontract. Even so, during the first 30 days that plaintiff worked on the project, it was able to waterproof less than 7,000 square feet per day (and on some days less than 3,000 square feet).

Plaintiff immediately informed defendant of the problems that it was encountering, and defendant advised doing a number of things to alleviate those problems, such as mixing the product with paint thinner and preheating the cans containing the product. Plaintiff followed these suggestions, but none of them resulted in any substantial improvement in the product's initial utility.

About 30 days after plaintiff's first use of the Deckseal, however, defendant supplied additional Deckseal that had been produced some time after the date that the first batch had been manufactured. From the time that this "new" material was furnished, a substantial increase in the area being covered (up to between 8,000 and 10,000 square feet per day) was experienced, athough plaintiff continued to use three or four kettles and a crew of 10 or 11.

Altogether, plaintiff used approximately 16,000 gallons of Deckseal supplied by defendant at a cost of about $53,000. In addition, in the last few days of the work, plaintiff used approximately 4,700 gallons of another material, obtained from another source. With this product, plaintiff was finally able to achieve a daily production of work approximating the 13,500 square feet of area initially forecast by defendant, although an increased number of kettles and workers continued to be used.

Plaintiff's evidence was that its actual "cost" to perform its subcontract was $218,078, as contrasted with the $153,995 contract price that it received. This "cost" figure, like the contract figure, included actual direct labor and other costs, and an allowance for additional overhead and for profit. The trial court found that 90% of the difference between these two figures (after adjustments for amounts owed to defendant by plaintiff and for acknowledged credits due plaintiff) represented the damages incurred by plaintiff as a result of the failure of Deckseal to perform as warranted by defendant. The other 10% was attributed to other causes.

## I.

Defendant first argues that, since plaintiff did not "cover," *i.e.*, purchase goods in substitution for those that were to be provided by the seller, upon discovery of the defect in the product, it could not recover any consequential damages for breach of warranty. We disagree.

The remedies of a buyer of goods for his seller's breach of an express or implied warranty are enumerated by the Uniform Commercial Code (UCC). If a buyer, who has accepted the goods, then learns of their nonconformity and gives notice to the seller of that nonconformity under § 4–2–607(3), C.R.S., he may recover the difference between the actual value of the goods and their value as warranted, as well as any incidental and consequential damages. Section 4–2–714, C.R.S. *See* 4 R. Anderson, *Uniform Commercial Code,* § 2–714:3 (3d ed. 1983).

For this purpose, consequential damages include:

"Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and *which could not reasonably be prevented by cover or otherwise.*" Section 4–2–715(2)(a), C.R.S. (emphasis supplied)

This statutory provision is merely a particularized statement of the general rule that a wronged party cannot recover for those damages that reasonable actions on his part would have prevented. *See* 4 R. Anderson, *supra,* § 2–715:30. This statutory provision will not prevent or reduce recovery if the buyer's actions are reasonable and undertaken in good faith. *S.J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524 (3rd Cir.1978); *Seekings v. Jimmy GMC of Tucson, Inc.,* 130 Ariz. 596, 638 P.2d 210 (1981). Moreover, the burden of proving that the buyer's losses could have been avoided is upon the seller. *S.J. Groves & Sons Co. v. Warner Co., supra. See Cherokee Investment Co. v. Voiles,* 166 Colo. 270, 443 P.2d 727 (1968).

Further, a seller cannot rely upon a buyer's failure to acquire substitute goods for that seller's defective goods, if the other goods were equally available for the seller to acquire and to provide to the buyer, and such actions on the seller's part could have reduced the buyer's damages. If such acquisition is reasonable under the circumstances, but neither party undertook that step, the loss should fall on the party breaching the sales agreement. *See S.J. Groves & Sons Co. v. Warner Co., supra.*

In this case, plaintiff's evidence was that it did not attempt to cover by buying another product initially because, upon notification of the defects, defendant assured plaintiff that following defendant's various suggestions would result in a defect-free product; that the "new" batch of Deckseal supplied by defendant, while still defective, was much improved over the former; and that, having paid defendant the total amount owed for the full amount of Deckseal that was to be used, acquisition of a substantial amount of another product would have resulted in a financial hardship.

In addition, while the reasonable inference from the evidence is that the substituted product used by plaintiff in the late stages of its work was equally available to both parties, defendant did not prove that this substituted product would have performed as he had initially warranted Deckseal's performance, *i.e.*, that it would cover 13,500 square feet per day by use of two kettles and a crew of five. While the substituted product worked much better than the Deckseal product, it was used in conjunction with three or four kettles and an enlarged crew.

Finally, defendant failed to prove the extent to which plaintiff's losses could have been prevented by use of the substitute product at an earlier stage of the work. Absent some evidentiary basis for estimating such savings, there existed no grounds for the trial court to determine the extent to which, if at all, plaintiff's failure to cover enhanced the damage otherwise sustained by it. *See Cherokee Investments Co. v. Voiles, supra.*

The trial court made no explicit findings upon the question of the reasonableness of plaintiff's actions. However, implicit in its

award of damages to plaintiff was a determination that, in light of all of these circumstances, plaintiff acted reasonably and in good faith. *See National Advertising Co. v. Department of Highways*, 751 P.2d 632 (Colo.1988). In view of this record and the trial court's refusal to allocate the entire difference between the contract price and plaintiff's ultimate cost to the deficiencies in the Deckseal, there is substantial evidentiary support for the court's implicit rejection of defendant's assertion that plaintiff did not cover his loss by using a substitute product. *See Prutch v. Ford Motor Co.*, 618 P.2d 657 (Colo.1980). That rejection is, therefore, binding on appeal. *Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979).

## II.

Defendant also claims that the trial court committed error in awarding plaintiff damages for its claimed increased overhead and increased kettle rental expenses. We agree only in part with defendant's contentions.

### A.

In preparing its bid, plaintiff included an allowance for its general overhead costs. The relationship between these costs and the direct costs incurred for a particular project was calculated, on an annual basis, as a percentage of the direct costs. This percentage relationship was then used in calculating the overhead costs included within plaintiff's initial bid.

■ Likewise, a figure representing increased overhead costs was added to the total costs plaintiff calculated it expended in performing its obligations under the subcontract. And, the trial court awarded as damages 90% of the difference between plaintiff's bid price and its calculated total cost of performance. Thus, a substantial portion of these damages consists of a figure representing general operating expenses, such as office rent, salaries of administrative employees, and the like, not directly attributable to the work on this project.

■ The UCC specifically authorizes a seller, in the event the typical measure of damages is insufficient, to collect "reasonable overhead" as an item of damages in the case of a contract breach by a buyer. Section 4–2–708(2), C.R.S. In our view, recovery of such overhead expenses is also available to buyers in those instances where § 4–2–715, C.R.S., would authorize the recovery of consequential damages, provided the evidence establishes a reasonable basis for estimating them.

■ In Annot., 3 A.L.R.3d 689 (1965), various formulae are considered for estimating overhead costs, and the author concludes that:

"[I]f a company can establish that its overhead expenses over a period of time have borne a certain ratio to its variable expenses for labor and materials, and if the company can prove the amount of labor and materials allocable to a particular transaction, then it may be possible to allocate to overhead expenses that portion of the cost of labor and materials which overhead expenses have constituted in connection with other transactions."

We adopt this conclusion as stating an appropriate standard for the recovery of overhead costs.

Here, the testimony was that plaintiff had undertaken as many as 200 projects per year, that its accountant had, on an annual basis, calculated the ratio between direct costs and overhead costs, and that that ratio was used in calculating the overhead costs attributable to this project. While there was no testimony as to the precise formula used in making this calculation, we conclude that this testimony was sufficient, although perhaps no more than barely so, to support the trial court's award. *See Tull v. Gundersons, Inc.*, 709 P.2d 940 (Colo.1985); *Comfort Homes, Inc. v. Peterson*, 37 Colo.App. 516, 549 P.2d 1087 (1976).

### B.

■ When plaintiff's representatives first conferred with defendant, defendant offered to rent two kettles to plaintiff for a

rental price of $400 per month per kettle, and plaintiff submitted its bid based upon that quotation. However, the actual written contract entered into between plaintiff and defendant called for a rental rate of $30 per kettle per day, a rate substantially higher than that previously quoted.

The difference between the rental rate originally quoted and the rental rate established by the contract between plaintiff and defendant was included in the overall cost increases attributable by plaintiff to this project and the court used this overall figure in computing plaintiff's damages. This was error.

Since there was no firm commitment made by defendant to supply kettles to plaintiff, except pursuant to the written agreement, and since the written agreement expressly called for the higher rental rate, there was no basis for plaintiff's claim that the difference in the rental rates for the two kettles originally contemplated was recoverable as damages. Plaintiff was, of course, entitled to recover the full cost of any additional kettles required. Thus, to the extent that the total damages awarded to plaintiff by the trial court included any amount for the higher rental rate for two kettles, the total damage award must be reduced. *See Henry Bosch Co. v. Guiry Brothers Wall Paper Co.*, 99 Colo. 379, 62 P.2d 1325 (1936).

The judgment is affirmed, except to the extent that the amount of damages awarded includes an amount for increased rentals for two kettles, and the cause is remanded to the trial court for recalculation of the damages due plaintiff in accordance with the views expressed herein.

PIERCE and METZGER, JJ., concur.