[No. 34863. Department Two. May 28, 1959.]

UNION TANK WORKS, INC., *Respondent*, v. WILLIAM E. EHLERS COMPANY, INC., *Appellant*, GEORGE A. O'CON- NELL *et al.*, *Respondents.*[1]

[1]Reported in 339 P. (2d) 696.

*Riddell, Riddell & Williams*, for appellant.

*Garvin, Ashley & Foster*, for respondent.

ROSELLINI, J.—This is an action brought by the respondents for recovery of damages for an alleged breach of warranty of fitness in the sale of four hundred electric heating elements, in which the appellant cross-complained for damages based upon an alleged breach of a contract to purchase twenty-four hundred additional elements. The trial court found for the respondents on their complaint and awarded damages in the amount of $3,996, being the purchase price of two hundred ninety-six elements. The appellant's cross-complaint was dismissed.

The appeal has been taken on a short record, and, as the appellant states in its brief, except for the issues relating to the cross-complaint, the only disputed issue of fact before the court is the value of the goods purchased at the time of the delivery. The finding of the court that there was a breach of warranty is unchallenged. Likewise, it is conceded that the purchase price represented the value of the elements had they been as warranted.

Briefly, the facts are these: Early in 1955 the respondents O'Connell, doing business as Universal Sheet Fabricating Company (hereafter referred to as Universal), a copartnership engaged in the manufacture and sale of oil furnaces (the respondent Union Tank Works, Inc., is its successor in interest), secured a contract to fabricate a commercial cooking oven, operated with electric heating elements, for Miracle Broiler Company, the holder of manufacturing and

sales rights under applicable patents. Ovens of the same basic design but slightly smaller had been manufactured by another manufacturing agency, for which appellant had supplied the elements.

Universal purchased from the appellant elements to be used in its ovens, under circumstances giving rise to an implied warranty that they would be fit for use in commercial cooking establishments under certain designated conditions. The elements proved to be unfit for such use, and their design was such that they could not be used in any other type of oven.

Commencing in November, 1955, Universal called the appellant's attention to the fact that elements were burning out, and asked that the cause of such failures be determined and corrected. After a series of conversations between representatives of the parties relative to the cause of failures, Universal wrote to the appellant on September 4, 1956, advising that the elements were not holding up and were unsatisfactory, and concluded with this sentence: "We would like to return the balance of the elements in stock to you for credit as they are causing us irreparable damage."

After this letter, negotiations between the parties ceased and this suit followed.

The findings of fact upon which error is assigned are as follows:

Finding 13: "Under some conditions the elements performed satisfactorily but under other conditions some elements failed. Under some conditions existent in commercial kitchens contaminants enter the elements through the unsealed terminal ends eventually causing a short and thus burning out the elements. In the course of cooking, corrosive materials could deposit on the sheath of the elements and if so deposited would tend to make the sheath porous and eventually admit the contaminants through the sheath thus causing a breakdown. When grease and other contaminants enter the elements, they tend to speed up the breakdown due to carbonization. The failure of some elements under the conditions above outlined renders them unsuitable for use in commercial cooking ovens. Some be-

ing thus unsuitable, they had no value whatsoever to the plaintiff."

Finding 14: ". . .. At the time of their delivery to plaintiff these elements had no value."

The gist of the appellant's argument, as we understand it, is that finding 14 is not a finding at all, but a conclusion, and rests upon that portion of finding 13 which pertains to the failure of some, but not all, of the elements; that this finding was insufficient to support such a conclusion, and the burden was upon the respondent to prove which elements were subject to failure and which were not.

■ ■■ The undoubted rule is that stated in *Mills v. Meyer*, 40 Wn. (2d) 369, 243 P. (2d) 491:

"The uniform sales act, as adopted in Washington, Rem. Rev. Stat., § 5836-69 . . . [RCW 63.04.700], provides in part as follows:

" '. . . (6) The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty.

" '(7) In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty.'

"The burden of proof is upon the appellant to establish the amount of his damages with reasonable certainty, measured by these statutory provisions."

Insofar as the short record before us and the findings show, the respondents' evidence tending to establish the worthlessness of the elements at the time of delivery (when it is conceded they were in a defective condition) was, in summary, as follows:

Of the twenty-six ovens which were sold to the Miracle Broiler Company, one was used by that company in its sales office at Seattle, eleven were sold to distributors and fourteen to restaurants, hotels and other commercial cooking establishments. The oven used in the Miracle Broiler Company's sales office was installed there on August 1, 1955, and used for demonstration purposes. Two elements burned

out on November 10, 1955, and were replaced. Thereafter, from time to time, upon request, Universal forwarded elements to seven of the Miracle Broiler Company's customers to replace elements as they burned out in seven ovens located in Washington, Oregon, Nevada, and Idaho. No requests for replacements were received from or on behalf of any of the other ultimate purchasers. The number of elements forwarded were four in January, 1956, four in February, eight in March, twelve in April, seven in May, two in June, two in July, two in August, seven in September, ten in October, six in January, 1957, five in April, two in July, two in August, and four in November, 1957.

(The Miracle Broiler Company did not live up to its contractual commitments to Universal and in June, 1956, acknowledged its inability to do so and released Universal from its contractual obligations.)

It was conceded that any failure which occurred in the first twenty-seven months of use was due to a defect in the element.

Experts testifying for the respondents stated that some failures were caused by incipient cracks which had their origin in the bending of the elements, which was necessary to make them conform to the design of the oven. According to the testimony of these experts, there was no practical way of testing for incipient cracks, as any test which would reveal their presence would also damage the elements. One of these experts testified that, on the basis of tests made by him and his knowledge of the failures which had occurred with respect to the elements which were in commercial use, he could prognosticate a probable rate of failure due to incipient cracks of between fifty to one hundred per cent.

According to expert testimony, another cause of failure was the fact that moisture could enter the elements through the unsealed terminal ends. This characteristic alone, one witness said, rendered them unsuitable for use in commercial kitchens. In a dry room, the elements would function satisfactorily unless some other defect interfered, but in most commercial kitchens there is a high degree of moisture.

William O'Connell, a copartner in Universal, when asked

by the court, without objection, what the elements were worth to him when he received them, stated that, to him, they were "not worth a dime." The cost of testing to determine which elements were usable and which were not would be prohibitive, he said, and probably would exceed their purchase price.

There was also evidence that the material from which the sheath was made was of such nature that in the course of cooking, corrosive matter could collect on, and deteriorate, the sheath, allowing contaminants to enter the element and cause failure.

■ In short, the evidence showed, and the court was entitled to accept this evidence, that there was no practical way to segregate the sound elements, if any, from those containing incipient cracks; and that all of the elements were subject to failure from the excessive moisture and contaminants often found in commercial kitchens. Of course, the elements could be sold, but the probability was that between fifty and one hundred per cent would be returned, and the same probability of failure applied to the replacements. This is evidenced by the fact that in fourteen ovens containing fifty-six elements, which should have lasted at least twenty-seven months, seventy-seven replacements were required in less than two years. The only reasonable conclusion to be reached is that the elements were worthless to the respondents, and it is admitted that they could be used by no one else. The appellant suggests no way in which a segregation could be achieved and no basis on which an evaluation could be made. Nor does it suggest that the elements have any salvage value, and, according to the record before us, no evidence was offered to rebut the respondents' evidence that they were worthless.

■ The appellant insists, however, that the respondents cannot recover the purchase price since they did not return the goods and sue for rescission. But the law is otherwise. The sales act, RCW 63.04.700, provides in part:

"(1) Where there is a breach of warranty by the seller the buyer may, at his election: (a) Accept or keep the goods and set up against the seller the breach of warranty

by way of recoupment in diminution or *extinction* of the price; . . ." (Italics ours.)

If the price may be extinguished on a recoupment, there can be no logical reason why it may not be recovered in an action for damages. The only difference between the two remedies is that in one action the buyer is the defendant, and in the other he is the plaintiff—a difference which cannot affect the theory of his cause of action or the substance of his rights.

The cases in this and other jurisdictions do not support the appellant's theory. *Smelt Fishermen's Ass'n v. Soleim*, 39 Wn. (2d) 524, 236 P. (2d) 1057, was a case in which the purchaser of certain fish which proved to be unfit for human consumption claimed the right to set off their price against a claim of the seller. There was no finding of their value at the time of delivery other than the finding that they were spoiled and unfit for human consumption. After stating the rule that, ordinarily only nominal damages can be recovered even though, as in that case, the warranty and its breach are evident, we said:

"The rationale of the rule, as applied to this case, is that the goods, though useless for one purpose, may well have had substantial value for other purposes. . . ."

The rule was held inapplicable in that case because the evidence showed that, upon examining the fish, the officers of the seller association had recognized the worthlessness of the fish, inasmuch as they had told the buyer to dispose of all but five boxes of the fish, which they proposed to show to the association's fishermen. The purchase price was held to be the proper measure of the buyer's damages.

There is also in the case before us evidence from which it can be inferred that the appellant recognized the worthlessness of the elements when it disregarded Universal's offer to return them. In addition, there is in the appellant's brief, as we have noted, no suggestion that the elements had any value, much less substantial value, for any purpose other than for use in the respondents' ovens. It is true that in the manufacture of the elements, the appellant used a

stock item, which in its unbent form was adaptable for use in other heating devices, but there is no evidence and no contention that, once bent, it could be unbent and resold.

Another case, the facts of which bear great similarity to those appearing in this case, is *Goldstein v.. J. W. Carter Co.*, 157 Wash. 405, 288 Pac. 1063, wherein a retail dealer in shoes was allowed to recover the cost of unsalable shoes which had been supplied to him, even though he had made no offer to return them. Also affirming the right to recover the purchase price where the goods are shown to be worthless, even though there has been no offer to return them, is *Albert v. Kopplin Molding Corp.*, 247 F. (2d) 107 (C. A. 8th, 1957). In that case the plaintiff had manufactured a mold to be used by the defendant for a specific purpose, for which purpose it proved worthless. In the plaintiff's action for the balance due on the purchase price and the cost of repairs, the defendant's counterclaim for the amount paid on account was allowed and the plaintiff's complaint was dismissed. Approving this disposition of the case, the appellate court said:

"There is ample evidence in our present case to establish that the mold was completely worthless for its intended purpose. The mold was ordered for the very special purpose of molding plastic parts for an activator for practice mines. The demand for such a mold, even if it operated properly, would be extremely limited. Upon the basis of the evidence in this record as to the mold's faulty operation and its failure to mold parts which would meet Government specifications, the court was justified in determining that the mold as a tool or device was absolutely worthless. . . ."

Other cases in accord are *Bracker v. American Nat. Food*, 133 Cal. App. (2d) 338, 284 P. (2d) 163; *Vacuum Ash & Soot Conveyor Co. v. Huyler's*, 101 N. J. L. 147, 127 Atl. 203. Our research has disclosed no authority to the contrary. In *Clarage v. Heinmueler*, 146 Misc. 216; 261 N. Y. S. 801, damages were denied to a buyer who purchased golf counters for resale, because he failed to prove the number which were defective and the number which complied with the contract. But there was no showing in that case, so far as

the opinion reveals, that the defects were latent or that the cost of segregation would be prohibitive.

The appellant places strong reliance upon the case of *Mills v. Meyer, supra.* Recoupment for breach of warranty was not allowed in that case because the purchaser of the shuffleboards which were the subject of the action had failed to show their value at the time of delivery. There was no question but that the shuffleboards had some value, and the defendant's error was in confining his proof to their value at the time of the action, after they had been subjected to an undetermined amount of use, instead of producing evidence of their value at the time of delivery. The evidence here is that the elements were unfit for their intended purpose and were worthless from the time they were made. *Mills v. Meyer, supra,* therefore, is not a parallel case.

We conclude that the trial court correctly determined the applicable measure of damages. No error is assigned to its computation of the number of elements for which recovery of the purchase price should be had; and we therefore assume that all of the parties are satisfied with the conclusion of the court in that regard.

Another point which has not been argued is the legal significance of Universal's act in offering to return the elements. Consequently, we do not decide whether this offer, coupled with the prayer in the complaint for the return of the purchase price, constituted an election to rescind.

█ In regard to its cross-complaint, the appellant assigns error to the court's finding that no order for an additional twenty-four hundred elements was placed. The answer to the cross-complaint admits, the appellant points out, that an order was placed. Therefore, it insists, the respondents were precluded from introducing evidence in contradiction of the admission. Assuming the correctness of this proposition, it does not appear that the appellant was prejudiced by the finding, since its evidence failed to show that the order was accepted according to its terms before it was canceled or that the appellant would have been in a position to deliver elements according to the schedule speci-

fied by Universal or to furnish elements free of the defects which characterize the elements involved in this action. This being the case, a mere finding that an order for additional elements was submitted would afford no basis for an award of damages to the appellant, and the error, if any, was harmless.

The judgment is affirmed.

WEAVER, C. J., MALLERY, HILL, and FOSTER, JJ., concur.

July 3, 1959. Petition for rehearing denied.