[No. 60970-5. En Banc. December 15, 1994.]

FEDERAL SIGNAL CORPORATION, *Respondent*, v. SAFETY FACTORS, INC., *Appellant*.

*James V. Handmacher* (of *Bonneville, Viert, Morton & McGoldrick*), for appellant.

*Barbara Stratton* and *Law Offices of Blado Stratton, P.S.*, for respondent.

MADSEN, J. — This case presents issues of express warranties, implied warranties, mitigation, and damages. Appellant Safety Factors, Inc. (Safety Factors) bought seven Night Warrior light towers from Respondent Federal Signal Corporation (Federal Signal). Safety Factors experienced a number of problems with the equipment and never paid Federal Signal for the towers. Federal Signal sued Safety Factors to recover amounts due and Safety Factors counterclaimed for damages for breach of warranty. The trial court found in Federal Signal's favor. The case was then certified for appeal to this court. We reverse several of the trial court's conclusions and remand for additional findings.

## FACTS

Federal Signal sued Safety Factors to collect amounts owed for items purchased, including the price of the light towers.[1] Safety Factors counterclaimed that Federal Signal breached both express and implied warranties and that it had suffered incidental and consequential damages as well as general damages. Safety Factors alleged no specific efforts to mitigate other than giving Federal Signal notice of the breaches. In its reply, Federal Signal did not plead failure to mitigate, but only raised affirmative defenses of an account stated, limited warranty, excluded damages, and disclaimer. Trial was before the bench.

Safety Factors is in the business of renting, repairing, and selling equipment. The Night Warrior light towers were purchased for rental and sale. Steve Fors, president of Safety

---

[1] We address only those issues relating to the Night Warrior light towers.

Factors, testified that before Safety Factors purchased the light towers he and David Robbins of Federal Signal discussed the capabilities and features of the Night Warrior and compared this newer product to the TPME, an older model with which Safety Factors had good experiences. These statements were made either orally or in an advertising brochure. Safety Factors purchased seven of these newer towers.

Before renting or selling the Night Warriors, Safety Factors tested the towers "through a full field of motion" for approximately 5 minutes without incident. Report of Proceedings (RP), at 182-83, 211-12. However, problems arose as soon as the towers were used in the field, beginning in late February 1989 with the first rental customer, Tucci & Sons. The first night Tucci & Sons used the towers, it experienced what the parties referred to as the "restrike problem". RP, at 183-84. The lamps would either fail to relight following an interruption of operation or shut down once the lamps reached full intensity. One of the towers would not run because the fuel lines were reversed. Safety Factors replaced these with other towers after it unsuccessfully attempted to repair the defective towers. On the second night, one of the replacement towers failed due to the restrike problem. Tucci & Sons experienced the problem with all of the rental towers over a 4- or 5-day period until it threw the towers off the job.

Within a week, Brian Gillespie, Safety Factors' service manager at the time, contacted Herbert Moore at Federal Signal regarding the problem. Moore ran some tests but could not simulate the problems. He then came out to Safety Factors in an effort to resolve the problem. Moore testified that he visited twice, but Gillespie could only recall one visit "for sure". RP, at 188. Moore said that the second time he was met by representatives from Hatz, the manufacturer of the Night Warrior engine, and Lima, the manufacturer of its generator. This time, Moore brought a prototype device that he believed would fix the towers, once installed. The restrike problem was finally traced to the Lima generator, which did

not meet the towers' power requirements. Moore concluded that Lima would have to take care of the problem.

By sometime in May, a local Lima generator service company, Cascade Electric, retrofitted all of Safety Factors' Night Warriors with Moore's device, at no cost. "The fix essentially was a voltage regulator device that would go between the generator as the source of power and the lighting unit, which is a ballast in a light bulb, . . . and it was a voltage regulator that compensated for the mismatch between the source of power and the use of power." RP, at 50. Before renting the towers out again, Safety Factors tested the towers to insure that they would not fail. The towers were ready for rental by the end of May 1989 and Safety Factors resumed renting the towers in June.

Immediately, another major problem arose. Excessive oil leakage from the diesel motor caused the towers to shut down. Thomas Hallett, Safety Factors' current service manager, described the problem: "The crankcase would separate from the generator mount on a cast iron casting. That was bolted to the engine. Where it bolted to the engine, the bolts would loosen and oil would pour out, and it would stop." RP, at 402; see also RP, at 191-92. Gillespie opined that this was caused by "[e]xcessive vibration". RP, at 216. He attempted to fix this problem by tightening the bolts and using Locktight and silicone "to lock this device down so it wouldn't vibrate apart again". RP, at 191. This solved the problem, but only temporarily. Gillespie called Federal Signal and was referred to All Power, the "authorized service agent" for Hatz, the engine manufacturer. RP, at 328-29. Federal Signal said the problem would be fixed "under warranty". RP, at 215-17. At trial, witnesses testified that they were unsure what warranty applied. According to Fors, Federal Signal referred them to Hatz, stating that the problem was with the engine manufacturer, not with it. Hatz then referred Safety Factors to All Power. Fors admitted that Safety Factors did not contact Federal Signal again because "they said that they wouldn't . . . accept any of the problems for the engine". RP, at 333. It was undisputed that Safety Factors

had to switch "[q]uite a few" towers for its customers as a result of this leakage problem. RP, at 223.

All Power was backlogged with other work and the first unit was not accepted for repair until October. Ultimately, the repairs were unsuccessful; the repaired units "[c]ontinuously" leaked oil within 2 weeks of being rented. RP, at 329, 402. Hallett estimated that the units went back to All Power twice each. All Power attempted to repair the units for 9 to 12 months before refusing to do any more repairs under warranty. Safety Factors itself eventually came up with a solution. Hallett described the problem as a design defect — insufficient motor mounts. He was able to "make the bond between where the oil leak is a more rigid unit so the vibration doesn't affect it . . .". RP, at 403. He added a gasket and a different commercial engine sealer, "replaced the Allen head screws with hex headed bolts and a lock washer", "squashed the threads on the bolts to make them lock and not come out", and "used a commercial thread locker chemical to hold them in". RP, at 404. By the end of July 1991, Hallett had made this repair to every tower.

Donald Beck of Robinson Construction, a customer of Safety Factors, testified that the towers had a problem with the low pressure oil lights as well. Beck stated that the light would come on without reason, causing the towers to shut down automatically. Beck testified that his company solved the problem on one tower by clipping the wires to the oil light.

Another problem that arose "from day one" was the failure of the electric winches to raise and lower the lights, unlike the "touch of a finger" representations in the brochure. RP, at 299, 396; Def.'s Ex. 20; see also RP, at 122. Beck stated that his company "had a lot of trouble" with the winches: "They'd go up fine, but half the time you couldn't get them back down." RP, at 435. Because of this, his company had to grab the towers and move them by crane "because it was the only way you could move them with the tower standing 30 feet in the air". RP, at 435-36. This technique caused damage to the mast of one of the light towers. Hallett testified that the winches were "grossly underpow-

ered". RP, at 396. He further explained: "The electric motor that dr[o]ve this had a high carbon steel gear that ran against some aluminum or pot metal teeth on the inside of this wheel. The motor was underpowered for this whole system to start with, and with this aluminum, any sort of binding in the mast, it would chew the gear up and the motor would go out." RP, at 396.

The problem with the winches did not end there. They were not watertight and leaks caused the brushes to stick and the towers to shut down. This problem occurred "[o]ften", contradicting the all-weather durability representations in the brochure. RP, at 397. To solve this problem, Hallett dismantled the winches, cleaned all the pieces, and reinstalled them. He had to do this to "[v]irtually all" of the towers. RP, at 397. Safety Factors "recently" solved all of its winch problems by replacing the pulleys and installing "more robust . . . hand-operated winches, rather than electric". RP, at 397.

Other problems occurred. Excessive vibration caused the ignitions mounted on the generator to vibrate apart. The switch itself and its contacts would come apart, the wires that connected the ignition switch to other components would break off, and the unit would shut down. This happened every time each of the towers was used. Hallett finally fixed the problem by rewiring the entire system. He installed a "more robust alternator" and replaced the plastic ignition switches — which he described as "of insufficient strength for the vibration" — with "an after market steel switch". RP, at 400-01.

The exhaust pipes "rusted out and fell off often" because they were too short. RP, at 398. Hallett explained:

This Hatz motor is inside a covered enclosure on a trailer so they want to route the exhaust gases outside the unit. They routed them to a rectangular-shaped tube that ran down to the ground with a short piece of flexible steel exhaust pipe that was just clamped on to the muffler, stuck in the hole in the side there. And they were too short to reach. And, again, with this motor rocking back and forth when it was started up or was shut down would pull it out of the hole and disintegrate.

RP, at 398. To fix this problem, Hallett replaced the original pipes with longer ones on most of the units.

There was testimony that the main power cable was designed poorly as well. The tower used a long loose cable that had to be wound up as it was lowered instead of a pre-coiled cable that kept itself in position. Hallett pointed out: "You had to wind it up as it was lowered . . . these things are used in the dark, that's their purpose is to light the night. If it's dark and all this 20 feet of cable is hanging down there, when you lower the tower it's very easy to pinch it off, and they did that often." RP, at 399. This problem often resulted in cable wires being cut, requiring splicing or replacement. This occurred with every tower at least once and "probably more". RP, at 400.

In his oral decision, the trial judge stated that "the only warranties that applied in this case were the implied warranties of merchantability and fitness for a particular purpose". RP, at 543. He stated that these warranties were breached but said that the restrike problem was the only breach going "to the essence of the contract". RP, at 543. He concluded that no express warranties were made. Conclusion of law 3, Clerk's Papers (CP), at 71. The court listed no facts to support this conclusion. Despite the breach, the court denied lost rentals even for the period related to the restrike problem because it believed Safety Factors failed to mitigate by not revoking its acceptance and purchasing different towers. The trial judge did not allow damages for lost sales or for delivery costs of rental replacements following the various breakdowns.

Against the amount owed for the purchase of these towers, the court did allow credit for 109 hours of repair at the shop rate totaling $4,305.50. However, the judge denied a request to double the shop rate for these repairs despite Safety Factors' argument that its shop could have used that time to repair other customers' equipment. The court also found that the repairs billed by All Power were reasonable and allowed for another credit in the amount of $1,459.76. The amount left owing, after these credits, was $55,974.92.

On that amount, the court awarded prejudgment interest at 1 percent a month for 33 months to total $18,471.72. The court entered judgment for Federal Signal in the amount of $74,446.64.[2]

On October 12, 1993, the Court of Appeals certified this case to this court.

## ANALYSIS

Safety Factors argues that the trial court made erroneous findings of fact and conclusions of law with regard to issues of breach of warranty, mitigation, and damages. We will address the issues in the order they arose in trial.

## I

### Express Warranties

The trial court concluded that Federal Signal made no express warranties to Safety Factors concerning the Night Warrior light towers. Conclusion of law 3, CP, at 71. Safety Factors contends that the trial court's conclusion to this effect is contrary to the evidence presented. The trial judge made no findings of fact in support of his conclusion, stating that it was unnecessary.

■■ Contrary to the judge's belief, findings must be made on all material issues in order to inform the appellate court as to " ' "what questions were decided by the trial court, and the manner in which they were decided . . ." ' ". *Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 707, 592 P.2d 631 (1979) (quoting *Bowman v. Webster*, 42 Wn.2d 129, 134, 253 P.2d 934 (1953) (quoting *Kinnear v. Graham*, 133 Wash. 132, 133, 233 P. 304 (1925))). This court has recognized that the nature and degree of exactness of required findings depends on the circumstances of the particular case. *Groff v. Department of Labor & Indus.*, 65 Wn.2d 35, 40, 395 P.2d 633 (1964) (citing *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 419, 87 L. Ed. 1485, 63 S. Ct. 1141 (1943)).

---

[2]In addition to the amounts related to the towers, the court found that an unrelated amount of $6,744.66 was undisputedly owed and added interest at 1 percent a month for 37 months, totaling $9,240.18.

In this case, significant evidence was presented regarding express warranties. Safety Factors' purchase of seven Night Warrior towers was made following personal contact between Steve Fors and David Robbins. Robbins said that they discussed "the feature changes" of the Night Warrior (the newer, not-yet-produced model) versus the TPME (an older model originally produced by another company). RP, at 15-16. Fors testified that Robbins told him that the Night Warrior was comparable to and of higher quality than the TPME, a model with which Fors had good experiences and which Robbins knew Fors currently had in stock. Robbins testified that it was possible he told Fors that Night Warriors were sturdier than TPME's but said he did not "remember exactly what went on in that discussion". RP, at 34.

Fors also stated that Robbins left literature advertising and explaining the features of the Night Warrior. Fors testified that Robbins gave him the literature at the time Robbins was trying to sell the towers; Fors found the literature in his files of old quotes. Robbins testified that he was unsure whether he had given it to Fors. Among other things, the literature stated that the tower is "built tough for long lasting, reliable performance" and "will stay ready and roadworthy in all kind[s] of weather and work environments". RP, at 299-300; Def.'s Ex. 20. Fors testified that Robbins' oral representations for sale "basically spoke to what their brochure says". RP, at 299. Based on this record, we believe that an adequate review requires a remand for entry of findings of fact which show an understanding of the conflicting contentions and evidence as well as a knowledge of the standards applicable to the determination. *See Groff*, at 40.

To guide the court in its effort, we will briefly address the questions of law presented in this case which should be considered. *State v. Russell*, 68 Wn.2d 748, 751, 415 P.2d 503 (1966). This dispute involves a commercial goods transaction; thus, we turn to Article 2 of the Uniform Commercial Code (U.C.C.) as enacted and codified in Title 62A.2 of the RCW. RCW 62A.2-313, which governs the creation of express warranties, states:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

. . . .

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that [the seller] have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

The comments elaborate: " 'Express' warranties rest on 'dickered' aspects of the individual bargain, and go so clearly to the essence of that bargain that words of disclaimer in a form are repugnant to the basic dickered terms." Official cmt. 1, RCWA 62A.2-313.

■ The trial court therefore must first identify whether any verbal representations were made equating the Night Warriors and the TPME's, and, if so, whether these representations were of such character as to create an express warranty. The more specific a statement, the more likely it is an affirmation of fact or a promise. 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 9-4, at 445-47 (3d ed. 1988). Further, affirmations of fact or promises will generally relate to the quality of a good. Debra L. Goetz et al., Special Project, *Article Two Warranties in Commercial Transactions: An Update*, 72 Cornell L. Rev. 1159, 1171 (1987). In contrast, more general statements such as "You meet the nicest people on a Honda" and a Honda bike is a good one for children are a seller's opinion or commendation rather than affirmations of fact. *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 152, 727 P.2d 655 (1986). Additional factors to consider are whether any hedging occurred, the experimental nature of the good, a buyer's actual or imputed knowledge of the true condition of the good, and the nature of the defect. Andrew M. Baker et al., Special Project, *Article Two Warranties in Commercial Transactions*, 64 Cornell L. Rev. 30, 61 (1978); *see also* White & Summers, at 446-47.

Second, the trial court must determine if and when Federal Signal gave Fors an advertising brochure and if it con-

tained any affirmations of fact or promises. If the trial court here finds that the brochure was given to Fors during the sales negotiation, it must closely examine the language of that brochure. The analysis then is similar to the verbal instance. This court specifically dealt with the question of when advertisements create express warranties under the U.C.C. in *Touchet Vly. Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 831 P.2d 724 (1992). In that case, a sales brochure contained statements that the advertising company could "design to your specifications' ", that fabrication " 'is carefully checked by our quality control department", that its designs would " 'meet the strictest building codes' ", and that " '[y]our particular requirements will determine the most suitable style of construction' ". *Touchet Vly.*, at 348. This court found that such statements constituted express representations promising "a building of certain quality" rather than puffing in advertising, *i.e.*, an opinion or commendation about the goods. *Touchet Vly.*, at 348. Moreover, commentators agree that a written statement is less likely to be puffery. White & Summers, at 445-47.

Lastly, if the court finds that at least one affirmation of fact or promise was made either orally or through the brochure, the trial court must determine whether any of the affirmations of fact or promises were "part of the basis of the bargain" under RCW 62A.2-313(1)(a).

## II

### Implied Warranties

Next, the trial court concluded that both the implied warranties of merchantability and of fitness for a particular purpose were breached with respect to the restrike problem. Conclusion of law 6, CP, at 72. Safety Factors contends that the trial court erred in limiting the breach of the implied warranties and the award of consequential damages to the period of the restrike problem. We agree.

### A. Implied Warranty of Merchantability.

The trial judge stated that only the warranty of merchantability was breached by the restrike problem because

the other problems "aren't the kind that go to the essential purpose of the light towers". RP, at 544. He expanded: "They were still usable. They had to be repaired more often than necessary, and I think that the defendant's entitled to be compensated for the repairs that they had to make to these light towers for the oil leak and for the other little problems that were showing up . . .". RP, at 544. He stated that the restrike problem was the only breach going "to the essence of the contract". RP, at 543. This is not the proper test. Rather, the test is whether the goods are merchantable under RCW 62A.2-314.

RCW 62A.2-314 defines a breach of the warranty of merchantability by looking to the general uses of a product and expectations in the trade. According to RCW 62A.2-314(2):

> Goods to be merchantable must be at least such as
>
> (a) pass without objection in the trade under the contract description; and
>
> (b) in the case of fungible goods, are of fair average quality within the description; and
>
> (c) are fit for the ordinary purposes for which such goods are used; and
>
> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
>
> (f) conform to the promises or affirmations of fact made on the container or label if any.

This list "does not purport to exhaust the meaning of 'merchantable' nor to negate any of its attributes not specifically mentioned in the text of the statute, but arising by usage of trade or through case law". Official cmt. 6, RCWA 62A.2-314. In the case of fungible goods, a breach of any one of these requirements constitutes a breach of the warranty of merchantability. Baker et al., at 74-75; Goetz et al., at 1206-07. Courts generally use a reasonableness standard to determine whether the requirements of U.C.C. § 2-314(2) have been met. Goetz et al., at 1207.

In Washington, "the question of whether a good is merchantable depends on the particular facts of the case". *Tallmadge v. Aurora Chrysler Plymouth, Inc.*, 25 Wn. App. 90, 94, 605 P.2d 1275 (1979). Where "a significant segment of the buying public objects to buying . . ." a good, it "does not pass *without objection* in the trade". *Thomas v. Ruddell Lease-Sales, Inc.*, 43 Wn. App. 208, 214, 716 P.2d 911 (1986). However, " 'merchantable' is not synonymous with 'perfect.' " White & Summers, at 476; *see also* Baker et al., at 76. A product which conforms to the quality of other brands in the market will normally be merchantable. White & Summers, at 473; *see also* Baker et al., at 75-76. The requirement most often cited is that of "fit for the ordinary purposes". RCW 62A.2-314(2)(c). This phrase embodies the concept "that goods be reasonably fit for their usual, intended purpose", *i.e.*, "reasonably safe when put to their ordinary use and reasonably capable of performing their ordinary functions". (Footnotes omitted.) Goetz et al., at 1208-09. Factors such as the usage in the trade, the price actually paid as compared to the standard price, the characteristics of similar goods manufactured by others, and government standards and regulations regarding such a good are considerations when evaluating merchantability.

Although the trial judge made no findings of fact comparing the Night Warriors to other light towers on the market, the record contains substantial evidence that considering *all* the problems, the Night Warriors were far below the quality of other light towers on the market. Fors and several of his customers testified that they have never had as many problems with any other light tower and that these machines had so many problems that it was hard to use them for their ordinary purposes. While we find that substantial evidence supports the trial court's conclusion that the warranty of merchantability was breached, considering all the problems we conclude that the court erred in limiting the breach to the restrike problem.

We are also concerned that the trial court's conclusions in this area are contradictory. In its conclusion of law 6, the

court stated that "the breach continued through May, 1989" when the restrike problem was solved. CP, at 72. However, it awarded all repair costs (expenses and shop time) incurred until July 1991 as "consequential damages" in its conclusion of law 9. CP, at 72. First, the cost of repairs does not represent consequential damages. Rather, under the facts of this case, these costs describe the difference in value which is a measure of actual damages for breach of contract. Second, neither actual nor consequential damages are merited unless a breach has occurred.

Because substantial evidence exists in the record to support the court's award of repair costs for difference in value through the end of July 1991, we affirm the trial court's award of repair costs in conclusion of law 9. However, we reverse its conclusion of law 6 with regard to when the breach ended and remand for new findings of fact and conclusions of law regarding the end date of the breach and repair costs, if any, after July 1991.

### B. Implied Warranty of Particular Purpose.

The trial court also stated that the implied warranty of particular purpose, which it variously referred to as "fitness for purpose" or "fitness for use", was breached as well. Finding of fact 3, CP, at 68; conclusion of law 6, CP, at 72; RP, at 543. Unfortunately, the trial court made no specific findings of fact that would support the existence of an implied warranty of particular purpose nor is there any discussion of the basis for that warranty in the judge's oral opinion or written conclusions. Although we are concerned that the judge's conclusion does not comport with the law regarding implied warranties of particular purpose, we will not address this issue further since neither party has directly raised it.

### III
### Mitigation of Consequential Damages

At trial, the judge found as a matter of both fact and law that Safety Factors could have and yet did not mitigate its damages, and on that basis denied any consequential damages for lost rentals and sales. Safety Factors contends that while the extent of damages is an element of proof for the

nonbreaching party under RCW 62A.2-715(2), Federal Signal as the breaching seller has the burden of proof to show that damages could have been mitigated and that the buyer did not do so. The issue before us requires that we decide where RCW 62A.2-715(2)(a) places the burden, the exact burden it places on each party, and whether the burden was satisfied in this case.

## A. Who Has the Burden Under RCW 62A.2-715?

The source of the confusion over who has the mitigation burden may be the U.C.C. itself. RCW 62A.2-715(2) merely states:

> Consequential damages resulting from the seller's breach include
>
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . .[.]

The inclusion of the phrase "which could not reasonably be prevented by cover or otherwise" may define the damages that can be recovered, putting the burden on the buyer, or may simply recognize that the common law duty to mitigate applies, placing the burden upon the seller.

For guidance, we look to the comments following the provision and to the general purposes underlying the U.C.C. The official comments following the provision do not require either result. Official comment 2 states:

> Although the older rule at common law which made the seller liable for all consequential damages of which [the seller] had "reason to know" in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise. Subparagraph (2) carries forward the provisions of the prior uniform statutory provision as to consequential damages resulting from breach of warranty, but modifies the rule by requiring first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise.

RCWA 62A.2-715. Official comment 4 states that "[t]he burden of proving the extent of loss incurred by way of consequential damage is on the buyer", but does not discuss who has the burden of showing mitigation. RCWA 62A.2-715.

The comments following the Washington provision, however, imply that the U.C.C. did not seek to change the common law regarding mitigation, but only intended to incorporate that law. The comments note that part (a) of this provision "appears to effect no substantive change" and that Washington "decisions have at least recognized the possibility of a limitation similar to that imposed by this part under the doctrine of mitigation of damages". Washington cmt. (2)(a), RCWA 62A.2-715.

A review of other U.C.C. provisions lends additional weight to this view. The U.C.C. requires that its provisions "be liberally construed and applied to promote its underlying purposes and policies". RCW 62A.1-102(1). The general purposes of the U.C.C. are persuasive in this case. First, the U.C.C. expresses an intent that the common law regarding commercial contracts apply unless "*explicitly* displaced" by U.C.C. provisions. (Italics ours.) Official cmt. 1, RCWA 62A.1-103. RCW 62A.2-715 does not explicitly displace the common law regarding mitigation. Second, the U.C.C. requires that remedies be "liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this Title or by other rule of law". RCW 62A.1-106. Official comment 3 explains that "consequential", "special" or "penal" damages "are not defined in terms in the Code, but are used in the sense given them by the leading cases on the subject". RCWA 62A.1-106. This implies that common law mitigation principles are incorporated in the definition of "consequential" damages.

A majority of courts considering the question have concluded that U.C.C. § 2-715(2)(a) is a codification of common law mitigation rules. *See TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 550 (6th Cir. 1981); *Plastic Moldings Corp. v. Park Sherman Co.*, 606 F.2d 117, 120 (6th Cir. 1979); *S.J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 528 (3d Cir. 1978); *Larsen v. A.C. Carpenter, Inc.*, 620 F. Supp. 1084, 1131 (E.D.N.Y. 1985), *aff'd*, 800 F.2d 1128 (2d Cir. 1986); *Kohlen-*

berger, Inc. v. Tyson's Foods, Inc., 256 Ark. 584, 594, 510 S.W.2d 555 (1974); Smith-Wolf Constr., Inc. v. Hood, 756 P.2d 1027, 1031-32 (Colo. App. 1988); Clark v. International Harvester Co., 99 Idaho 326, 347, 581 P.2d 784 (1978); Lawrence v. Will Darrah & Assocs., Inc., 445 Mich. 1, 15 n.18, 516 N.W.2d 43 (1994) (citing Lorenz Supply Co. v. American Standard, Inc., 100 Mich. App. 600, 610, 300 N.W.2d 335 (1980), aff'd, 419 Mich. 610, 358 N.W.2d 845 (1984)); Bemidji Sales Barn, Inc. v. Chatfield, 312 Minn. 11, 17, 250 N.W.2d 185 (1977); Whitaker v. Farmhand, Inc., 173 Mont. 345, 356-57, 567 P.2d 916 (1977); Hardwick v. Dravo Equip. Co., 279 Or. 619, 626, 569 P.2d 588 (1977); Hepper v. Triple U Enters., Inc., 388 N.W.2d 525, 530 (S.D. 1986); LTV Aerospace Corp. v. Bateman, 492 S.W.2d 703, 708 (Tex. Civ. App. 1973).

The reasoning of one majority court is particularly persuasive.[3] Most recently, a California Court of Appeal held that U.C.C. § 2-715(2)(a) imposes the burden of proving mitigation on the seller under California's traditional mitigation law. Carnation Co. v. Olivet Egg Ranch, 189 Cal. App. 3d 809, 229 Cal. Rptr. 261 (1986). The court argued that the U.C.C. provision "did nothing to alter preexisting California law on the right to recover consequential damages and the duty to mitigate such losses". Carnation Co., at 816. Although the court acknowledged the official comments quoted above, it concluded that the U.C.C. did not change the burdens between the parties regarding mitigation. Instead, official comment 2 only recognized that the liberality of the former rule was "modified" but did not demonstrate that § 2-715(2)(a) "was intended to act as 'a restraint on the liberality of the common law.'" Carnation Co., at 815.

---

[3]Other courts have given little substantive discussion to the issue, other than to declare who has the burden. See Carnation Co. v. Olivet Egg Ranch, 189 Cal. App. 3d 809, 816 n.8, 229 Cal. Rptr. 261 (1986) (listing majority and minority courts); see also 2 Roy R. Anderson, Damages Under the Uniform Commercial Code § 11:21, at 76-80 (1992) (same); Roy R. Anderson, Incidental and Consequential Damages, 7 J. L. & Com. 327, 391-92 nn. 276, 278 (1987) (same). But see Cates v. Morgan Portable Bldg. Corp., 780 F.2d 683 (7th Cir. 1985) (discussing the issue in some depth).

In the court's view, official comment 4, regarding the extent of the damages, did not determine the allocation of the burden of proof regarding mitigation. Rather, "[i]t is entirely possible for the injured party to bear the burden of proving the *extent* of consequential damages while the breaching party has the duty of proving those items which *limit* the award of consequential damages". *Carnation Co.*, at 816. Acknowledging support for both positions, the court concluded that placing the burden on the breaching party was more "intuitively attractive, since proof that there has been a failure to mitigate adequately will reduce the damages awarded and, therefore, seems more in the nature of a defense than an element of the plaintiff's affirmative case". *Carnation Co.*, at 817-18. The court likened mitigation proof to the burden of proving comparative negligence, which lies with the party asserting the comparative negligence of the other party and stated that "it is sensible to require the defendant to prove those items which go to reduce the plaintiff's recovery, as plaintiffs would have little incentive to do so". *Carnation Co.*, at 818.

This position is generally consistent with Washington law. Washington appellate courts have held that under RCW Title 62A "the burden of proof as to mitigation of damages is on the party asserting the requirement". *Harper & Assocs. v. Printers, Inc.*, 46 Wn. App. 417, 424, 730 P.2d 733 (1986), *review denied*, 108 Wn.2d 1002 (1987); *Jet Boats, Inc. v. Puget Sound Nat'l Bank*, 44 Wn. App. 32, 43-44, 721 P.2d 18, *review denied*, 106 Wn.2d 1017 (1986). In finding that under RCW 62A.2-715 the seller is "required to prove that damages were not mitigated or insufficiently so", the *Harper & Assocs.* court concluded that official comment 2 incorporated the common law regarding mitigation of damages. *Harper & Assocs.*, at 423-24.

Finally, we note that the U.C.C. is an attempt to create uniformity. RCW 62A.1-102(2)(c). Considering this goal, the comments to U.C.C § 2-715 cited earlier, as well as the U.C.C. generally and the logical appeal of the majority view,

we are persuaded that RCW 62A.2-715(2)(a) codifies common law principles of mitigation.

## B. The Burden Imposed.

Because more than one type of "burden" exists, we must next decide exactly what burdens are imposed on the breaching seller under RCW 62A.2-715. The "burden of proof" as used by courts and commentators may refer to any one of, or a combination of, the burden of pleading, the burden of producing evidence, and the burden of persuasion. The burden of pleading and producing evidence are usually encompassed within the term the "burden of production". This burden is to "produc[e] evidence, satisfactory to the judge, of a particular fact in issue". Edward M. Cleary, *McCormick on Evidence* § 336, at 947 (3d ed. 1984). "The burden of producing evidence on an issue means the liability to an adverse ruling (generally a finding or directed verdict) if evidence on the issue has not been produced." *McCormick on Evidence,* at 947. The burden of persuasion is "the burden of persuading the trier of fact that the alleged fact is true". *McCormick on Evidence*, at 947. It comes into play "only if the parties have sustained their burdens of producing evidence and only when all of the evidence has been introduced". *McCormick on Evidence*, at 947.

The U.C.C. cases provide little guidance on who has each of these burdens. 2 Roy R. Anderson, *Damages Under the Uniform Commercial Code* § 11:21, at 78 (1992). Most courts consider mitigation to be an affirmative defense that must be raised and proved by the breaching party. *See, e.g., Marefield Meadows, Inc. v. Lorenz*, 245 Va. 255, 427 S.E.2d 363 (1993); *see also* Anderson § 11:21, at 76 ("The general common law rule is, of course, that the failure of the plaintiff to mitigate damages is a plea in avoidance which must be specifically pled and proved as a matter of defense.") This issue is waived if not raised. A Washington appellate court recently found that mitigation is an affirmative defense that is generally waived if not pleaded, unless harmless (*i.e.,* the substantial rights of a party were not affected), asserted in a CR 12(b) motion, or tried by the implied consent of the par-

ties.[4] *Bernsen v. Big Bend Elec. Coop., Inc.*, 68 Wn. App. 427, 433-34, 842 P.2d 1047 (1993).

This court has not yet decided whether mitigation is an affirmative defense nor have we addressed any division of the burdens between the parties. However, we have stated that under the common law doctrine of mitigation the breaching party "has the burden of showing that reasonable alternative courses of action were, in fact, open to the non-breaching party". (Footnotes omitted.) *Smith v. King*, 106 Wn.2d 443, 451, 722 P.2d 796 (1986) (citing *Young v. Whidbey Island Bd. of Realtors*, 96 Wn.2d 729, 638 P.2d 1235 (1982)).[5] In the interest of uniformity and of maintaining consistency in our own laws on mitigation, we now hold that mitigation under RCW 62A.2-715 is an affirmative defense. We believe that any technical shifting of the burden of production is unnecessary. It is axiomatic that each party must sustain a certain burden of production in any civil dispute. We conclude that the buyer has a duty to mitigate and can find no justification for shifting the burden of production from the seller who must both assert that the buyer's demonstrated lack of mitigation was unreasonable as well as carry the ultimate burden of persuasion on that issue.

## C. Whether the Burden Was Met.

Lastly, this court must determine whether the seller in this case met its burdens or waived the issue. As noted earlier, the seller did not plead failure to mitigate or cover in any of its documents. However, because the parties can be

[4]CR 8(c) requires parties to "set forth affirmatively . . . any other matter constituting an avoidance or affirmative defense". However, under Washington's CR 15(b), when express or implied consent exists, the parties are deemed to have pleaded the issue.

[5]The *Harper & Assocs.* court reads *Young* and *King* as shifting "the burden". *Harper & Assocs. v. Printers, Inc.*, 46 Wn. App. 417, 424, 730 P.2d 733 (1986), *review denied*, 108 Wn.2d 1002 (1987). We disagree with that court's interpretation of our holdings in those cases. We discussed no shifting of "the burden" in those cases but rather maintained that "the burden" regarding mitigation was on the party asserting the requirement. Nor can any shifting be implied from this court's discussion in those cases.

deemed to have impliedly tried an issue not pleaded under CR 15(b) and *Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 733 P.2d 530 (1987), this fact alone does not answer the question. We therefore must address whether the issue was impliedly tried by the parties.

This court addressed what constitutes implied consent in *Reichelt*. This court found the facts persuasive:

> The record contains a number of references to Reichelt's negligence claim. The affidavits filed in opposition to the motion for summary judgment expressly referred to the defendants' alleged negligence. In a reply to the plaintiffs' memorandum opposing summary judgment, one defendant addressed the negligence claim. Interrogatories filed by the defendants asked the plaintiffs to "[s]tate with specificity your basis for each and every allegation of negligence against each defendant . . . [.]" The plaintiffs responded with a detailed answer. Both sides addressed the negligence claim in oral argument, and the trial court ruled that its decision regarding the products liability claim "would also prohibit any cause of action based on negligence." The written order entered by the trial court referred several times to plaintiffs' causes of action.

*Reichelt*, at 767.

▮▮ Here, neither party mentions the issue in its pleadings or trial briefs and no interrogatories on the issue appear in the record. Nor did either party specifically bring up the issue of mitigation in its opening argument. The issue was directly mentioned only in Federal Signal's closing argument. At that point, Safety Factors argued that the issue had not been raised nor evidence introduced to support a finding that it had failed to mitigate.

A review of the record indicates that very little evidence was presented or solicited regarding the issue either. Evidence of other light towers was presented mostly by Safety Factors and it was presented for other reasons, such as establishing other manufacturers' repair history and warranties. The court asked a few indirect questions regarding cover. The court first asked about other lights that Safety Factors had in stock or had used and their differences. During a lull in questioning one day, the court asked Fors about "other similar mobile light towers on the market at the same

time" and about the cost and size of other manufacturers' light towers. RP, at 390-92. Fors stated that comparatively Federal Signal's light tower was more price competitive and smaller in size than all the other light towers on the market. The court did not ask whether Fors attempted to cover or whether cover was feasible. Safety Factors did present evidence that it notified Federal Signal of the restrike and oil problems and made efforts to repair and replace the towers so they would work and could be rented despite all their problems. In contrast, Federal Signal asked no direct questions regarding cover and presented no evidence that Safety Factors had failed to make other reasonable efforts to mitigate.

Finally, because the trial court's actions in this case could be a factor showing implied consent under *Reichelt*, we must also examine the trial court's consideration of the issue. In its oral decision, the court said that other towers were available and that the Plaintiff should have revoked acceptance and purchased substitute towers to cover for the 4 months of lost rental time when the Night Warriors were not working because of the restrike problem.[6] In its view, "that's the problem in this case". RP, at 544. The court cited *Harper & Assocs.* and stated that in that case the plaintiffs' failure to cover was not fatal because "the defendants just didn't show that the plaintiffs in that case could go out and have these particular printing requirements fulfilled by somebody else". RP, at 545. With only the evidence described above before it, it stated:

> I think that there was a demonstration that mitigation could have occurred in this case. There were other brands of light towers available and I think the plaintiffs demonstrated that if there was a concern, then Safety Factors could have gone out and bought other brands of light towers and used them for their rental purposes instead of just waiting to see if the problem was going to get solved.

RP, at 545-46.

---

[6]The code does not require a buyer to revoke acceptance when faced with nonconforming goods. *See* RCW 62A.2-608 (providing that a "buyer *may* revoke [its] acceptance" (italics ours)).

This conclusion is neither legally correct nor supported by substantial evidence. A buyer's duty to mitigate under RCW 62A.2-715 may be satisfied by reasonable cover,[7] however, cover may not always be the best course of action. In using the "by cover or otherwise" language, RCW 62A.2-715(2)(a) implies that any means of reasonable mitigation will satisfy its requirements. As a broader concept, mitigation includes other measures such as repairing the goods so that they are usable in a breach of warranty situation. *See, e.g.,* Anderson § 11:16, at 58-59 (citing *District Concrete Co. v. Bernstein Concrete Corp.,* 418 A.2d 1030 (D.C. 1980) (finding that a choice between repair methods was reasonable when made)). Reasonable but unsuccessful efforts to mitigate do not preclude an injured party from recovery. White & Summers § 10-4, at 524 (referring to Restatement (Second) of Contracts § 350 (1981)). Thus, U.C.C. § 2-715 allows for other reasonable mitigation efforts such as repair. As for the evidence, here Safety Factors presented evidence that the repairs it undertook were reasonable. Safety Factors also provided its rental customers with working alternates. In comparison, Federal Signal presented no evidence that the products were similar enough to make cover reasonable or that the repair and replacement expenses were not reasonable.

Viewing the record as a whole, including the judge's conclusion regarding mitigation, we cannot find that the parties impliedly tried the issue in this case and therefore conclude that Federal Signal did not meet its burden. The issue was never mentioned prior to trial. At trial, the only evidence of

---

[7]In this regard, it is worth noting that courts have been somewhat deferential toward parties regarding whether cover was reasonable in a particular set of circumstances. "Presumably the covering buyer acts in good faith unless [the buyer] knowingly and without reason avoids a less expensive market in favor of a more expensive one." 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 6-3, at 287 (3d ed. 1988). "[T]he court should give [the buyer] wide latitude to reject the least expensive cover when there is any reasonable basis for choosing a more expensive cover". White & Summers § 6-3, at 287. An injured party "need not undertake 'undue risk or burden' in its effort to mitigate". White & Summers § 10-4, at 524.

mitigation came from Safety Factors and the questions of the court and is insufficient to support a finding that the parties impliedly consented to have the issue tried. Moreover, the trial court's conclusion regarding the issue was legally and factually incorrect.

In sum, we hold that the mitigation efforts referred to under RCW 62A.2-715 are the incorporation of the common law doctrine of mitigation. We further hold that, under RCW 62A.2-715, mitigation is an affirmative defense for which the seller bears the burdens of pleading, production, and persuasion. In this case, we find that Federal Signal waived the issue and reverse the trial court's conclusion.

## IV

### Damages

Safety Factors argues that the trial judge erred in not awarding damages for the difference in value, lost rentals, lost sales, and rental replacement delivery costs. We address each in turn.

 Because this is a U.C.C. case of accepted goods without revocation of acceptance, RCW 62A.2-714 governs all damage issues. This provision permits any buyer who has accepted goods and notified the seller of any nonconformity to recover damages for any loss incurred as a result. RCW 62A.2-714(1). Specifically, RCW 62A.2-714 provides:

(1) Where the buyer has accepted goods and given notification . . . [the buyer] may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

Under this provision, the buyer has the burden of proving the existence and extent of the damages caused by the seller's breach, but it only need establish a reasonable basis

for ascertaining the damages. Official cmt. 1, RCWA 62A.1-106; Anderson § 10:14; Baker et al., at 106; *see also Union Tank Works, Inc. v. William E. Ehlers Co.*, 54 Wn.2d 263, 266, 339 P.2d 696 (1959) (holding that the burden of proof is on the buyer under the Uniform Sales Act). The U.C.C. requires that the remedies provided for be liberally administered to compensate the injured party. RCW 62A.1-106(1).

■ We review a damages award from the perspective that

[a] trier of fact has discretion to award damages which are within the range of relevant evidence. An appellate court will not disturb an award of damages made by the fact finder unless it is outside the range of substantial evidence in the record, or shocks the conscience, or appears to have been arrived at as the result of passion or prejudice.

(Footnote omitted.) *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 850, 792 P.2d 142 (1990).

A. Difference in Value.

Under RCW 62A.2-714(2), damages for breach of warranty are defined to be the difference "between the value of the goods accepted and the value they would have had if they had been as warranted", or as commonly referred to, the difference in value. Safety Factors asserts that the court erred in failing to find that the difference in value here was the purchase price of the towers. Safety Factors did present evidence that the difference in value was the purchase price of the towers three individuals who used the light towers testified that, because of the problems the towers were having, they were worth basically nothing.

However, the towers were being rented throughout much of the period of the breach. Safety Factors provided no objective evidence of the market value or even of the appraisal value of the towers to give the court a basis for determining the value of the goods as accepted. Moreover, the testimony which was presented was arguably subjective and exaggerated. By refusing to award the purchase price, the trial court in effect held that Safety Factors failed to sustain its burden of proof that the difference in value was indeed the purchase price. The judge's holding to this effect is sustainable.

Safety Factors further argues that cost to repair is not an accurate surrogate in the case at bar because all costs to repair could not be determined and the trial court refused to award other related damages such as the cost of replacing the towers in the field. In response, Federal Signal contends that the evidence presented was not credible and that Safety Factors failed to sustain its burden to establish damages.

■ Courts generally recognize that "[r]epair costs are an appropriate alternative measure of damages for breach of warranty". *Miller v. Badgley*, 51 Wn. App. 285, 296, 753 P.2d 530, *review denied*, 111 Wn.2d 1007 (1988); Anderson § 10:06, at 16 ("[T]he overwhelming judicial consensus has been that [repair] costs are strong evidence of the difference between the value of the goods as accepted and their value as warranted."); White & Summers § 10-2, at 504-05 (noting that repair costs may be a "useful objective measurement of the difference in value", but pointing out that the measure has "limitations").

■ Safety Factors presented testimony regarding the time spent repairing the towers by its employees. Fors estimated the costs to be $8,611 for in-house shop time and $1,415.17 for All Power's shop costs not covered by warranty. The estimated expenses incurred in this regard after May 1991 have no exhibits to support them, but Fors estimated them to be "equal". RP, at 359. Safety Factors presented evidence of other repairs which the trial court did not award because it believed that it did not meet the appropriate level of proof. In this sense, the cost of repairs may not have compensated Safety Factors fully. However, the damages were not easily ascertained. "Where damages cannot be ascertained with precision, the trial court must exercise its sound discretion. The amount of the award will, therefore, not be overturned absent a showing of abuse." (Citation omitted.) *Barnard v. Compugraphic Corp.*, 35 Wn. App. 414, 418, 667 P.2d 117 (1983). Safety Factors had the burden of proof with regard to this issue and, if it did not sustain it, we will not read a finding that the burden was not sustained as an abuse of the trial court's discretion.

B. Lost Rentals: Proper Rental Rate and Expected Use Figures.

The court did not allow lost rentals because Safety Factors had failed to mitigate. Nevertheless, the court went on to state that the proof only supported awarding lost rentals for February to May of 1989 at a rate of $37.50 per day and at a 48 percent usage rate, totaling $15,112.50. Safety Factors maintains that the trial court erred in stating that these lower rates should apply. Safety Factors asserts that the evidence was undisputed that many of the rentals were made at the higher daily rate.

Safety Factors did indeed lose rentals because of the towers' poor performance. At least one first-time and long-sought-after customer, Tucci & Sons, threw the lights off the job because of the problems and rented towers from another company. Kiewit, another customer, phased out its rentals of the Night Warriors from Safety Factors and rented other towers from other rental companies because of the problems. Other customers said they would only rent from Safety Factors because of the outstanding service it provided. Safety Factors presented testimony that because of the repairs the towers could not be rented, forcing it to lose rentals. The record also shows that because of the towers' poor performance, Safety Factors was unable to charge for many of the rentals it did get.

Safety Factors presented uncontested estimates of the rental rate. Fors testified that rental rates would run $75 on a daily basis, $350 on a weekly basis, and $750 on a monthly basis. Fors explained the different rental rates in his testimony, the expectancies for each, and averaged them together to equal about $50 per day. While not the best evidence because of the problems the towers were having during this time, an examination of the customer billings contained in Exhibits 28 and 31 shows that even for that period at least as many rentals were made on the higher daily basis as were made on the lower monthly basis.

As for the proper expected use rate, Fors testified that Safety Factors usually rents light towers on a daily, weekly, and monthly basis and he gave target rental periods for each. Fors stated that the expected use rate of the industry was 65 percent and that Safety Factors itself sought to have its equipment rented an average of "50 percent to 65 percent of the time". RP, at 312-13, 318.

The trial court stated that because the towers were rented at a rate of 48 percent for a period of 10 months after the restrike problem was fixed, this should be the expected use rate on which lost rents would be awarded. The evidence at trial does not support such a conclusion. Because of the problems the light towers were having, actual use was necessarily lower than it would have been without these problems. Basing expected use on actual use is not justified in this case. Damages should be based on the undisputed measures presented by Fors: somewhere in the range of 50 to 65 percent.

The court's discussion of lost rentals was not a conclusion nor was it based on any findings of fact. Moreover, we believe the court's discussion may have been influenced by its erroneous conclusion that consequential damages were not appropriate. The question of lost rentals must, therefore, be remanded for consideration by the trial court in light of this opinion. On remand, the trial court should determine damages based on the evidence presented at trial regarding the average rental rate and the expected usage rate for the full period of the breach.

C. Lost Sales.

Safety Factors argues that the trial court erred in refusing to award consequential damages for lost sales when the evidence was "unrefuted" that Safety Factors bought these towers for rental or sale and that it lost sales because of the towers' poor performance. In his oral opinion, the trial judge stated that he did not award lost sales because he was not satisfied that Safety Factors met its burden of proof on this issue.

The trial court made no findings or conclusions regarding lost sales, yet a review of the record indicates that substantial evidence was presented in support of an award for lost sales as consequential damages. Safety Factors' witnesses testified that profits from potential sales to Tucci & Sons and Kiewit were lost because of the extremely poor performance of the towers on a rental basis. Based on the quotes given, the lost profits were estimated to be $18,200 for Tucci & Sons and $21,140 for Kiewit. Both companies bought light towers from other companies. The witnesses testified that performance was a big reason they did not buy from Safety Factors, although they did acknowledge that performance was perhaps not the only reason and that several considerations factor in to their decisions to buy equipment.

█ In Washington:

The precise amount of damages need not be shown with mathematical certainty. Damages must be supported by competent evidence in the record[;] however, evidence of damage is sufficient if it affords a reasonable basis for estimating the loss and does not subject the trier of fact to mere speculation or conjecture.

(Citations omitted.) *Interlake Porsche + Audi, Inc. v. Bucholz*, 45 Wn. App. 502, 510, 728 P.2d 597 (1986), *review denied*, 107 Wn.2d 1022 (1987).

It appears that the evidence presented gave the court a reasonable basis to conclude that the performance of these towers may have played a large role in Tucci & Sons' and Kiewit's willingness to buy from Safety Factors. Furthermore, Federal Signal presented no contrary evidence. Given the evidence in the record and the trial court's erroneous conclusion regarding the burden of proof on mitigation, we remand for the court to consider the evidence presented by Federal Signal in light of the burdens discussed in this opinion.

D. Rental Replacement Delivery Costs.

Safety Factors further contends that the trial court erred in failing to award it consequential damages to compensate for the cost of delivering replacement light towers to its customers in the field. Safety Factors argues that the evi-

dence was unrefuted that it had to regularly replace the light towers it rented to customers because of the towers' failure. After declining to award consequential damages based on his earlier erroneous conclusion on mitigation, the trial court in dicta went on to say that an award for replacement delivery time was not merited because he did not believe the numbers provided were "supported by enough credible evidence" or enough documentation. RP, at 598; see also RP, at 632, 635. Again, we are concerned with the standards applied by the trial court regarding consequential damages.

Damages do not need to be shown with mathematical precision. Official cmt. 1, RCWA 62A.1-106; *Interlake Porsche*, 45 Wn. App. at 510. Fors testified that they spent 100 hours at a cost of $18.25 an hour transporting replacements, for a total of $1,825. Safety Factors' two mechanics, Gillespie and Hallett, testified generally about the number of times they had to go out to sites to exchange nonworking light towers for working ones. One customer testified that someone at Safety Factors was at its rental site at least 5 days a week. Invoices generally showed that these towers had to be exchanged. This evidence was uncontested.

Safety Factors gave the trial court a reasonable basis for estimating damages that both parties acknowledged it had suffered. Given the number of problems these towers had, 100 hours does not seem unreasonable. Nor was the $18.25 an hour rate unreasonable, arrived at by dividing shop time rates in half, when his mechanics did the driving and exchanging and perhaps could have been billing shop time instead. Safety Factors did not seek mileage or gas expenses, which would also have been reasonable. While the proof was perhaps not as good as it could have been, this is not the standard by which the trial court should have judged the evidence. We therefore remand for new findings of fact and conclusions of law based upon the proper standard.

## CONCLUSION

This court remands in part for findings regarding whether any representations were made orally or in the brochure and if such representations created an express warranty as well

as for additional findings and conclusions with regard to the implied warranty of merchantability. We reverse the trial court's conclusion regarding mitigation and remand for a determination of consequential damages for lost rentals, lost sales, and rental replacement delivery costs due Safety Factors from February 1989 through the end of the period of the breach.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.